UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

PRIORITY SEND

CIVIL MINUTES -- GENERAL

Case No.  **CV 04-1137-JFW (FMOx)**                           Date: February 23, 2005

Title:   UGG HOLDINGS, INC. -v- CLIFFORD SEVERN, et al.

**DOCKET ENTRY**

**PRESENT:**
HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

Shannon Reilly                              None Present
Courtroom Deputy                            Court Reporter

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
            None                                         None

**PROCEEDINGS (IN CHAMBERS):**    ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION [filed 01/25/05]

On January 25, 2005, Plaintiff filed a Motion for Summary Judgment and/or Summary Adjudication (the "Motion"). On February 1, 2005, Defendants filed their Opposition. On February 7, 2005, Plaintiff filed a Reply. The Court heard oral argument on Plaintiff's Motion on February 14, 2005. After carefully considering the arguments made at that hearing, the moving, opposing, and reply papers and the arguments therein, as well as the admissible evidence submitted by the parties, the Court grants Plaintiff's Motion in its entirety.

**I.    Factual and Procedural Background**

UGG Holdings, Inc. ("UHI"), which was acquired and recently merged into Plaintiff Deckers Outdoor Corporation ("Deckers" or "Plaintiff"), manufactures, imports and sells sheepskin boots, apparel and accessories under the brand "UGG." Defendants Clifford Severn and Percy Severn (collectively, "Defendants"), who do business under the name Koolaburra, also sell sheepskin boots. Prior to its acquisition by Deckers, UHI primarily sold its "UGG" boots via a network of specialty footwear and sporting goods stores, and via mail order catalogs. Deckers has since successfully repositioned the brand as a luxury line of sheepskin products–predominantly boots, but also including handbags and outerwear–widely available through high-end retailers, such as Nordstrom. Deckers' extensive efforts to promote the "UGG" brand have led to an exponential growth in the brand's popularity and recognizability. In fact, not only does Deckers regularly place "UGG" advertisements in major American newspapers and magazines, but the "UGG" brand also has received extensive unsolicited coverage in such periodicals and has been featured on

television programs and in motion pictures.[1]  As a result of this notoriety, the "UGG" brand's sales revenues exceeded $100 million in 2004.[2]

Plaintiff's "UGG" trademark, which is the only mark Plaintiff claims Defendants are infringing, dates back to the 1970s, when Brian Smith, who had come to the United States from Australia, founded UHI, a company that imported and sold Australian sheepskin boots.  Smith began using the trademark "UGG" in connection with UHI's boot business in December 1979.  In May 1986, Smith applied to the United States Patent and Trademark Office (the "USPTO") for registration of a design logo incorporating the terms "ORIGINAL UGG BOOT" and "UGG AUSTRALIA," in addition to a graphic depiction of a ram's head (the "Ram's Head Logo").  In October 1987, the USPTO registered the Ram's Head Logo.  In May 1995, UHI applied to the USPTO for registration of the term "UGG," and in May 1996, the mark was registered.  The parties agree that the "UGG" trademark has become incontestable pursuant to 15 U.S.C. § 1065.  In 1995, Deckers acquired UHI, along with all of UHI's trademarks.[3]

Defendants, who began selling their Koolaburra sheepskin boots in 1989, currently use the term "ug" in describing and advertising their sheepskin boots on tags and shoe boxes, and on their website.[4]  In August 1998, UHI discovered that Defendants were infringing UHI's "UGG" trademark.  UHI's counsel wrote to Defendant Clifford Severn, demanding that Defendants cease and desist their infringement.  Shortly after he received UHI's letter, Mr. Severn phoned UHI's counsel and advised that Defendants were not using either the "UGG" or the "UGH" marks, and were only using the term "ug" to describe their boots.  Although UHI's counsel subsequently sent Mr. Severn a letter confirming that Mr. Severn agreed to cease using the term "ug," Mr. Severn never responded to the letter, and disputes that he ever agreed not to use the term "ug."  Declaration of Clifford Severn, filed February 1, 2005 ("Severn Dec."), ¶¶ 14-15.  In February 2001, UHI learned that Defendants were continuing to infringe UHI's trademarks by using the term "ug."  UHI's counsel then sent Defendants a second "cease and desist" letter, which Defendants ignored.  After discovering in October 2003 that Defendants were continuing to infringe UHI's trademarks by using "ug," UHI's counsel sent a third "cease and desist" letter.  Defendants again ignored UHI's demand to cease and desist using the term "ug," and on February 19, 2004, Plaintiff filed the Complaint in this action.

---

[1] Deckers has spent over $8 million to advertise the "UGG" brand.  Declaration of John Kalinich, filed January 25, 2005 ("Kalinich Dec."), ¶ 17.

[2] Indeed, Deckers' revenues from its sales of "UGG" products have experienced double-digit growth in each of the past six years.

[3] In addition to "UGG" and the Ram's Head Logo, Plaintiff owns three other UGG-related marks: (1) a stylized version of the "UGG" word mark, (2) a logo incorporating the words "BABY UGGS" and (3) "UGHS."

[4] Defendants' shoe boxes prominently state, "ug boot . . . a fleecy-lined boot with an untanned upper . . . these boots really 'ug your legs!"  See Pair of Koolaburra's Sheepskin Boots (with Associated Packaging), lodged by Plaintiffs on January 25, 2004.  A hang tag attached to Defendants' boots describes them as "Australian 'Ug Boots and Slippers."  Id.

On March 2, 2004, UHI filed an Amended Complaint, which alleged federal and state law claims for (1) trademark infringement, (2) false designation of origin, (3) trademark dilution, (4) cybersquatting, (5) unfair competition, (6) trade disparagement, (7) unjust enrichment and (8) breach of contract.[5]  Plaintiff's Motion seeks summary adjudication only of its First Claim for Trademark Infringement and its Second, Fifth and Sixth Claims for Unfair Competition.

On August 24, 2004, Defendants filed an Answer alleging twenty-eight affirmative defenses and a First Amended Counterclaims against UHI, alleging counterclaims for (1) declaratory relief, (2) cancellation of trademarks, (3) false designation of source and origin, (4) toritious interference with prospective business and contractual obligations, (5) trade libel, (6) unfair competition and (7) violations of the Sherman Act and the Clayton Act. On August 24, 2004, Defendants also filed a First Amended Third Party Complaint, which realleged each of the claims alleged in the Counterclaims against Deckers. On October 1, 2004, the Court granted Plaintiff's motion to dismiss (a) Defendants' Seventh Counterclaim against UHI for violations of the Sherman Act and the Clayton Act, and (b) Defendants' identical Seventh Third Party Claim against Deckers. On January 21, 2005, the Court approved a stipulation entered into by all parties (1) substituting Deckers for UHI as plaintiff and (2) dismissing Defendants' Third Party Complaint. Therefore, Defendants and Deckers "are the only remaining parties in this action." Stipulation, p.1.

Plaintiff's Motion also seeks summary adjudication of Defendants' Second, Third, Fourth and Fifth Counterclaims, and of Defendants' Second Affirmative Defense (Laches), Fifth Affirmative Defense (Fraud in Obtaining Trademark Registration), Seventh and Nineteenth Affirmative Defenses (Genericness) and Eighth, Eleventh and Twentieth Affirmative Defenses (Absence of Likelihood of Confusion).

## II. Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the

---

[5] Paul Barclay and Barclay Holdings, Inc. (the "Barclay Defendants") were also named as defendants in the Amended Complaint. UHI and the Barclay Defendants entered into a Consent Judgment, which was signed by the Court on May 26, 2004.

case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.* 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).[6]

## III. Discussion

The central issue in this action concerns Plaintiff's claim that Defendants are infringing the registered trademark "UGG." In order to establish its claim for trademark infringement under both federal and state law, Plaintiff must demonstrate that (1) it owns a valid and protectable trademark and that (2) Defendants' use of the same or a similar mark causes a likelihood of confusion in the minds of the relevant consuming public. *See* 15 U.S.C. § 1114(1)(a); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987).

### A. Plaintiff's Trademark Is Valid and Protectable

It is undisputed that Plaintiff owns an incontestable trademark registration for its "UGG" mark.[7] UF 1, 8. The federal registration of a trademark with the USPTO constitutes "prima facie evidence of the validity of the registered mark, ownership of the mark and of the registrant's exclusive right to use the registered mark." 15 U.S.C. §§ 1057(b), 1115(a); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046-47 (9th Cir. 1999).

---

[6] A motion for summary adjudication is governed by the same standard as a motion for summary judgment. *See* Fed. R. Civ. P. 56; *Castlerock Estates, Inc. v. Estate of Markham*, 871 F. Supp. 360, 363 (N.D. Cal. 1994).

[7] Although UHI is identified on the registration as the owner of the "UGG" mark, Plaintiff Deckers acquired UHI, including its trademark assets, in 1995. Defendants and Counterclaimants Separate Statement of Genuine Issues of Fact, filed February 1, 2005 ("UF"), 7. Plaintiff's "UGG" trademark carries Registration Number 1,973,743. Kalinich Dec., Ex. B.

Although Plaintiff has established *prima facie* proof of the validity of the "UGG" mark, in addition to its ownership of, and exclusive right to use, the "UGG" mark, the presumption that arises from registration can be rebutted. *See Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) ("In trademark terms, the registration is not absolute but is subject to rebuttal. . . . [T]he plaintiff in an infringement action with a registered mark is given the prima facie or presumptive advantage on the issue of validity, thus shifting the burden of production to the defendant to prove otherwise. . ."); *Brookfield*, 174 F.3d at 1047 ("Brookfield's registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of Brookfield's exclusive right to use the mark on the goods and services specified in the registration. . . . Nevertheless, West Coast can rebut this presumption").

### B.     Plaintiff's Trademark Is Not Generic

Defendants' only challenge to the validity of Plaintiff's registered "UGG" trademark is that the mark is generic and therefore not entitled to trademark protection. Generic terms are "common words or phrases that describe a class of goods rather than an individual product." *Japan Telecom*, 287 F.3d at 872. A generic term "cannot become a trademark under any circumstances." *Filipino Yellow Pages*, 198 F.3d at 1147 (citation omitted). "If the primary significance of the term in the minds of the consuming public is that the term refers to the producer and not to the general class of goods or services, then the term is not generic." *Carcione v. The Greengrocer, Inc.*, 205 U.S.P.Q. 1075, 1077 (E.D. Cal. 1979) (citing *Surgicenters of America v. Medical Dental Surgeries*, 601 F.2d 1011, 1014 (9th Cir. 1979). Because the "UGG" mark is registered, it is entitled to "the specific presumption that [it] is not generic." *The Coca-Cola Company v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir. 1982). This presumption "places the burden of proving genericness upon the defendant." *Filipino Yellow Pages*, 198 F.3d 1143, 1146 (9th Cir. 1999).

Defendants attempt to meet their burden by offering the declarations of Glenn Kennedy (owner of a single retail surfboard store), Peter Townend, (former professional surfer and surfing magazine publisher) and Heather Kolkey (former footwear buyer for Nordstrom).[8] At best, each of these declarations provides only anecdotal evidence that the term "ug boots" has been used generically by various individuals at various times.[9] Defendants also rely on a series of advertisements from American surfing magazines from which they argue the term "Ugg" is used generically. However, almost all of these advertisements were, in fact, placed by Brian Smith himself and therefore are evidence only of his early use of the "UGG" trademark. Declaration of Paul H. Samuels, filed February 1, 2005 ("Samuels Dec."), Exs. 7-10. In fact, Defendants have submitted documentary evidence of only three instances of the possible generic usage of the term "ugg" in the United States, the most recent of which is over fourteen years old: (1) a single advertisement from a 1970 issue of *Surfing* magazine (Samuels Dec., Ex. 6), (2) a single advertisement from a 1980 issue of *Surfer Monthly* magazine (Samuels Dec., Ex. 1, pp. 185-87)

---

[8] None of these declarations attaches any documentary evidence.

[9] Plaintiff has submitted competing declarations from four footwear industry professionals, each of whom states that "UGG" is widely recognized in the industry as a brand-name and not a generic term. Jeuttner Dec., Exs. Q-T.

and (3) a photograph from a 1990 catalog published by Country Leather, UHI's supplier (Samuels Dec., Ex. 2).

Lastly, Defendants submit evidence of an entry from an edition of the Shorter Oxford English Dictionary ("OED") published in New York City, which defines the term "ugg boot" as "a kind of soft sheepskin boot," omitting any mention of the word's trademark status. Samuels Dec., ¶ 3, Ex. 5. Plaintiff responds to this evidence by demonstrating that after its counsel wrote to the editors of the OED to dispute the lack of trademark designation in the very entry cited by Defendants, the OED's Trade Marks Editor responded by agreeing to correct the oversight in future editions. Supp. Juettner Dec., Ex. B.

Defendants' evidence fails to demonstrate that the term "UGG" is generic. Moreover, Defendants have ignored the survey evidence, submitted by both Plaintiff and Defendants, clearly demonstrating that the term is non-generic. Plaintiff submitted evidence of a "Teflon survey" conducted by Field Research Corporation, under the supervision of Dr. E. Deborah Jay. Jay surveyed 313 women, ages 18 to 45, each of whom either had purchased a pair of boots or casual shoes (excluding athletic footwear) that cost $100 or more in the past 12 months or expected to do so in the next 12 months. Declaration of Kent R. Raygor, filed January 25, 2005 ("Raygor Dec."), Ex. D, p. 1. Respondents were asked whether they considered the term "UGG" to be a "common name or a brand name." *Id.* The data collected by Jay demonstrate that that "58% of all survey respondents thought UGG was a brand name, whereas only 11% thought UGG was a common name . . . . Among those survey respondents who had an opinion, 84% thought UGG was a brand name, and not a common name." *Id.* at p. 2. Therefore, Jay concluded that "the primary significance of the name or term UGG to women who are past or potential purchasers of boots or casual shoes that cost $100 or more is as a brand (and not a common or generic name)." *Id.* at p. 12. Michael Kamins, Defendants' genericness expert, reached conclusions similar to Jay's.[10] Kamins' survey indicated that 57% of respondents recognized "UGG" as a brand, while only 6% considered it a common name. Kamins Dec., Table 1.

Defendants next argue that the term "ugg" is generic in Australia, and therefore the Court should apply the doctrine of foreign equivalents to find that Plaintiff's "UGG" trademark is unprotectable in the United States. Under the doctrine of foreign equivalents, "a word commonly used in another country as the generic name of a product cannot be imported into the United States and be transformed into a valid trademark." 2 *McCarthy on Trademarks and Unfair Competition*, § 12:41. The doctrine requires that foreign words first be translated into English and then tested for descriptiveness or genericness. *Id.*; *Enrique Bernat F., S.A. v. Guadalajara, Inc.*,

---

[10] Although Kamins concedes at the outset of his declaration that Jay "used an accepted survey approach in her research" (Declaration of Michael A. Kamins, filed February 1, 2005 ("Kamins Dec."), ¶ 9), he later complains that Jay's study is inherently biased. *Id.* at ¶¶ 29-30. After closely examining Jay's report, the Court finds that her survey was fairly and scientifically conducted by impartial interviewers, under the supervision of a qualified expert, that the study used a sample of a relevant portion of potential consumers, that the questions upon which the results relied did not appear to be misleading or biased, and that the recordation of responses and assembly of data was handled in a completely unbiased manner.

Page 6 of 15

210 F.3d 439, 443 (5th Cir. 2000). The doctrine is supported by two rationales. First, as the Second Circuit has held, the doctrine rests on the following assumption:

> [T]here are (or someday will be) customers in the United States who speak that foreign language. Because of the diversity of the population of the United States, coupled with temporary visitors, all of whom are part of the United States marketplace, commerce in the United States utilizes innumerable foreign languages. No merchant may obtain the exclusive right over a trademark designation if that exclusivity would prevent competitors from designating a product as what it is in the foreign language their customers know best.

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d. 266, 271 (2d Cir. 1999). Second, the doctrine seeks to serve the interests of international comity. As the Fifth Circuit has explained, "because U.S. companies would be hamstrung in international trade if foreign countries granted trademark protection to generic English words, the U.S. reciprocates and refuses trademark protection to generic foreign words." *Enrique Bernat*, 210 F.3d at 443.

However, the doctrine is inapplicable where the term at issue is not a word from a foreign language, but instead comes from another English speaking nation, such as Australia. *Otokayama*, 175 F.3d at 270 (doctrine "applies when the word designates the product in a language other than English"); *Anheuser-Busch, Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 642 (8th Cir. 1984); *Carcione*, 205 U.S.P.Q. at 1077. For example, in *Carcione*, the defendant argued that because the term "greengrocer" is used generically in Great Britain, it was therefore unprotectable in the United States as a trademark. The court rejected defendant's argument, holding that "[s]ince we deal here with American trademark law, and thus American consumers, neither British usage nor the dictionary definition indicating such usage are determinative." *Carcione*, 205 U.S.P.Q. at 1077. In *Anheuser-Busch*, the Eighth Circuit considered whether the term "L.A.," used generically in Australia to signify "low alcohol beer," was a protectable trademark in the United States. The court held that because Australia was an English-speaking nation, the doctrine of foreign equivalents did not apply, and also concluded that "a term may be generic in one country and suggestive in another."[11] *Anheuser-Busch*, 750 F.2d at 642.

---

[11] It is undisputed that Plaintiff owns Australian trademark registrations for three marks: "UGH-BOOTS," "UGH" and a logo incorporating the words "UGG AUSTRALIA." (the "UGG AUSTRALIA mark"). Declaration of Michael J. Grant, filed February 7, 2005 ("Grant Dec."), Exs. A, D. UHI purchased the the "UGH" and "UGH-BOOTS" marks from Anthony Stedman in 1996. *Id.*, Ex. A. In 1999, Plaintiff registered the "UGG AUSTRALIA" mark with the Australian Registrar of Trade Marks (the "Registrar"). *Id.*, Ex. D. In approving Plaintiff's application to register the "UGG AUSTRALIA" mark, the Registrar determined that the mark was not generic. *Id.*, Ex. F, p. 286. The validity of Plaintiff's Australian trademarks has not been questioned in the courts of Australia. In fact, IP Australia, the Australian governmental agency responsible for registration of trademarks, has cautioned Australian sellers of sheepskin boots to seek legal counsel before using any of Plaintiff's UGG-related registered trademarks. Grant Dec., Ex. F.

Because there is no genuine issue of material fact as to the validity and protectability of Plaintiff's trademark, Plaintiff's Motion for Summary Adjudication of this issue is GRANTED.

### C. Plaintiff Has Demonstrated That There Is a Likelihood of Consumer Confusion

Plaintiff argues that there is a likelihood of consumer confusion between the term "ug" and Plaintiff's trademark "UGG," while Defendants allege in their Eighth, Eleventh and Twentieth Affirmative Defenses that there is no likelihood of consumer confusion. "The test for likelihood of confusion is whether a reasonably prudent consumer in the market place is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (internal quotations omitted). In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), the Ninth Circuit identified eight factors that should be considered in determining whether there is a likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the proximity or relatedness of the parties' goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) evidence of the defendants' intention in selecting and using the allegedly infringing name; (6) the degree to which the parties' marketing channels converge; (7) the type of goods and the degree of care customers are likely to exercise in purchasing them; and (8) the likelihood that the parties will expand their product lines. "This list of factors, while perhaps exhausting, is neither exhaustive nor exclusive. Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion. The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." *E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290-91 (9th Cir. 1992). The Court finds that the application of the *Sleekcraft* factors demonstrates a likelihood of consumer confusion.

#### 1. Strength of the Mark

The evidence demonstrates that Plaintiff's "UGG" mark is extremely strong. Because Plaintiff's "UGG" mark is registered, it is "presumed to be distinctive and should be afforded the utmost protection." *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 457, 462 (N.D. Cal. 1991). Since 1995, Plaintiff has spent more than $8 million advertising the "UGG" brand. Kalnich Dec., ¶ 17. *Bally Total Fitness Holding Corp. v. Faber*, 29 F. Supp. 2d 1161, 1164 (C.D. Cal. 1998) (noting plaintiff's extensive advertising expenditures in finding a strong mark). Plaintiff's "UGG" brand has received extensive coverage in several major American newspapers, including *The New York Times*, *The Chicago Tribune* and *The Wall Street Journal*, as well as in fashion magazines, such as *Elle*, *InStyle* and *Vogue*. *Id.* at ¶¶ 9-10. Indeed, Plaintiff's "UGG" brand was named 2003 "Brand of the Year" by *Footwear News* and 2004 "Product of the Year" by *Time Style & Design*. *Id.* at ¶ 18. Plaintiff's products have also been featured in several television programs and motion pictures. *Id.* at ¶¶ 12-13. *Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F.

---

Under these circumstances, it would be inappropriate for this Court to determine the validity of Plaintiff's Australian trademark registrations in the context of this case. *Vanity Fair Mill, Inc. v. T. Eaton Co.*, 234 F.2d 633, 647 (2d Cir. 1956) ("[W]e do not think it the province of United States district courts to determine the validity of trade-marks which officials of foreign countries have seen fit to grant. To do so would be to welcome conflicts with [such] administrative and judicial officers").

Supp. 2d 188, 198 (S.D.N.Y. 1999) (plaintiff's "commercial success, as shown by widespread media exposure and advertising expenditures, reinforces the strength of the mark"); *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 355 (S.D.N.Y. 1998) (strength of plaintiff's mark demonstrated by fact that its film "received vast unsolicited media coverage in mass circulation newspapers and magazines as well as coverage in the electronic media"). Accordingly, the first *Sleekcraft* factor weighs in favor of Plaintiff.

### 2. Proximity Or Relatedness Of The Goods

It is undisputed that the "Severns and Deckers are . . . in direct competition with identical products." UF 71. Both parties sell sheepskin boots. Accordingly, the second *Sleekcraft* factor weighs in favor of Plaintiff.

### 3. Similarity of the Marks

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. In this case, the two marks are nearly identical in visual appearance, with Defendant's "ug" mark merely omitting the final letter of Plaintiff's "UGG" mark. *BIC Corp. v. Far Eastern Source Corp.*, No. 99 CIV. 11385 HB, 2000 WL 1855116, at *4 (S.D.N.Y. Dec. 19, 2000) (finding "undisputable similarity between the marks" where the two marks differed only by one letter); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 118 F. Supp. 2d 792, 799 (E.D. Mich. 2000) ("no doubt" as to similarity of marks differing by only one letter). In addition, when pronounced, the two marks sound absolutely identical. *TV Land, L.P. v. Viacom Int'l, Inc.*, 908 F. Supp. 543, 550 (N.D. Ill. 1995) (finding similarity between the marks where identical in sound); *C&C Organization v. AGDS, Inc.*, 676 F. Supp. 204, 206 (C.D. Cal. 1987) (finding similarity between marks where each mark contained an identical-sounding term). Accordingly, the third *Sleekcraft* factor weighs in favor of Plaintiff.

### 4. Evidence of Actual Confusion

The record contains abundant evidence of actual consumer confusion. Plaintiff submitted a declaration from Roxanne Morgan, a consumer who returned a pair of Defendants' boots she had bought mistakenly thinking that she was purchasing Plaintiff's "UGG" boots. Declaration of Roxanne Morgan, filed January 25, 2005, ¶¶ 4-6. Paul Barclay, owner of Barclay Holdings, a Koolaburra distributor, testified that he was aware of at least thirteen occasions on which his customers returned Koolaburra boots they erroneously assumed to be Plaintiff's boots. Declaration of Geoffrey A. Baker, filed January 25, 2005, Ex. A, pp. 35:18-36:12. In fact, Plaintiff once even received a pair of Defendants' boots, returned by a consumer who mistakenly believed that the boots were manufactured by Plaintiff. Kalinich Dec., ¶ 28. Moreover, Dr. Barbara C. Luna, Defendants' damages expert, concedes that at least four of Defendants' customers have experienced actual consumer confusion between Plaintiff's boots and Defendants' boots. Raygor Dec., Ex. A (Expert Declaration of Dr. Barbara C. Luna), ¶¶12-14. Accordingly, the fourth *Sleekcraft* factor weighs in Plaintiff's favor.

### 5. Evidence of Defendants' Intent in Selecting and Using the Allegedly Infringing Mark

Plaintiff need not demonstrate that Defendants intended to deceive consumers by use of the "ug" mark. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157-58 (9th Cir. 1963). However, when the alleged infringer knowingly adopts a mark similar to another's, the Court can presume that he intended to deceive the public. *Sleekcraft*, 599 F.2d at 254. The evidence demonstrates that UHI informed Defendants in August 1998 that they were infringing Plaintiff's "UGG" mark. Juettner Dec., Ex. M. Despite receiving a letter from UHI's counsel demanding that they cease and desist their infringment, Defendants continued using the term "ug" to market their products. Juettner Dec., Ex. O. Defendants' decision to continue using a potentially infringing mark is evidence of Defendants' intent to deceive the public. *Glow Industries, Inc. v. Lopez*, 252 F. Supp. 2d 962, 1002 (noting that "[k]nowing adoption of a mark closely similar to another is a sound basis for inferring an intent to deceive"). Accordingly, the fifth *Sleekcraft* factor weighs in favor of Plaintiff.

### 6. Degree to Which the Parties' Marketing Channels Converge

Defendants do not dispute that the parties' marketing channels overlap significantly. Both Deckers and the Severns sell their products via the internet, both on their own websites and on various third-party websites, and through small specialty retail stores. UF 67-68. Accordingly, the sixth *Sleekcraft* factor weighs in favor of Plaintiff.

### 7. Type of Goods and the Degree of Care Customers Are Likely to Exercise in Purchasing Them

The less care consumers take in purchasing a product, the greater the likelihood that similar marks will confuse consumers as to the source or sponsorship of the product. *Sleekcraft*, 599 F.2d at 353. Footwear is a "common consumer item," purchasers of which are "unlikely to exercise a high degree of care in selecting." *K-Swiss, Inc. v. USA AISIQI Shoes, Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003). Moreover, Defendants concede that many sales of sheepskin boots occur via the internet, which does not provide the consumer with the ability to physically inspect the boots prior to purchase. UF 69. Accordingly, the seventh *Sleekcraft* factor weighs in favor of Plaintiff.

### 8. The Likelihood That The Parties Will Expand Their Product Lines

Plaintiff has already expanded its product line to include "UGG" clothing and accessories, such as handbags, ponchos and miniskirts. UF 25-28. Accordingly, the eighth *Sleekcraft* factor weighs in favor of Plaintiff.

Because there is no genuine issue of material fact as to the likelihood of consumer confusion, Plaintiff's Motion for Summary Adjudication of this issue is GRANTED.

**D. Defendants' Affirmative Defenses of Laches and Fraud In Obtaining Trademark Registration**

Plaintiff also moves for summary adjudication of Defendants' remaining affirmative defenses of laches (Second Affirmative Defense) and fraud in obtaining the "UGG" trademark registration (Fifth Affirmative Defense).

### 1. Affirmative Defense of Laches

Defendants argue that because UHI knew of Defendants' alleged infringement as early as August 1998, yet waited until February 2004 to file suit, Plaintiff's trademark claim is barred by laches. The Court finds that Defendants' laches defense fails for three reasons. First, deliberate infringers such as Defendants, "who knew of plaintiff's asserted rights," are not entitled to a laches defense. 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.06, at 12-125; *Danjaq v. Sony Corp.*, 263 F.3d 942, 957 (9th Cir. 2001) ("laches does not bar a suit against a deliberate infringer. This principle . . . remains the law of this circuit"). Second, the substantial evidence of actual consumer confusion is fatal to Defendants' laches defense. *Safeway Stores v. Bunnell*, 172 F.2d 649, 656 (9th Cir. 1949); *Resorts of Pinehurst, Inc. v. Pinehurst National Corp.*, 148 F.3d 417, 423 (4th Cir. 1998) ("strong proof of likelihood of confusion–indeed, actual confusion–trumps the [defense] of laches . . . The public interest in avoiding confusion and mistake requires that the [defense] of laches . . . not be rigidly applied when a strong showing of a likelihood of confusion is made"); *The Earth Technology Corp. v. Environmental Research & Technology, Inc.*, 222 U.S.P.Q. 585, 587 n.1 (C.D. Cal. 1983) ("generally laches will not be applied when proof of infringement is clear"). Third, Defendants have failed to offer any evidence that Plaintiff's alleged delay has caused Defendants any harm.[12] *Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*, 391 F.3d 1088, 1101-02 (9th Cir. 2004) (setting forth Ninth Circuit's six-factor test for determining whether laches bars a claim, including "extent of harm suffered by junior user because of senior user's delay"). Accordingly, Plaintiff's Motion for Summary Adjudication of Defendants' Second Affirmative Defense is GRANTED.

### 2. Affirmative Defense of Fraud in Obtaining Trademark Registration

Defendants also contend that Plaintiff's "UGG" mark is invalid because Smith fraudulently procured the "UGG" trademark registration from the USPTO. Specifically, Defendants argue that in a declaration accompanying the "UGG" trademark application, Smith misrepresented to the USPTO that there was "no other person that had the right to use the mark (or near resemblance) in commerce." Opposition, p. 11. Fraud in procuring a trademark "occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *Metro Traffic Control, Inc. v. Shadow Network, Inc.*, 104 F.3d 336, 340 (Fed. Cir. 1997) (citation omitted). A defendant asserting the affirmative defense of fraudulent procurement of a trademark

---

[12] Plaintiff concedes that Defendants may continue to market and sell their boots as "sheepskin boots." Reply, p. 13. Defendants have offered no evidence indicating that they will suffer any significant harm if forced to describe their product as "sheepskin boots" rather than "ug boots," beyond the minimal costs of removing the term "ug" from their tags and shoe boxes, and from their website.

registration "must prove the alleged fraud by clear and convincing evidence." *Id.* Because oaths and declarations submitted in connection with trademark registration are "phrased in terms of a subjective belief," it is "extremely difficult to prove fraud so long as the signer has an honestly held, good faith belief." *Woodstock's Enterprises, Inc. v. Woodstock's Enterprises, Inc.*, 43 U.S.P.Q.2d 1440, 1444 (T.T.A.B. 1997).

Defendants present no evidence that Smith acted with an intent to defraud the USPTO, but argue that Smith's representation was necessarily fraudulent because as "an Australian citizen, Smith knew of the fact that the term "ugg" (and all of its derivations) was a generic term." However, even if at the time Smith executed the declaration, he believed the term "ugg" to be generic in Australia, Defendants have not demonstrated that Smith had anything other than an "honestly held, good faith belief" that the term was not generic in the United States. Because Defendants have not carried their burden of demonstrating the affirmative defense of fraud in the procurement of a trademark registration, Plaintiff's Motion for Summary Adjudication of Defendants' Fifth Affirmative Defense is GRANTED.

### E. Defendants' Counterclaims

Plaintiffs also move for summary adjudication of four of Defendants' six remaining counterclaims: (1) cancellation of trademarks (Second Counterclaim), (2) false designation of source and origin (Third Counterclaim), (3) tortious interference with prospective business and contractual obligations (Fourth Counterclaim) and (4) Trade Libel (Fifth Counterclaim).

#### 1. Cancellation of Trademarks

Defendants argue that because Plaintiff's "UGG" mark is generic, five of Plaintiff's trademarks that incorporate the "UGG" mark are subject to cancellation.[13] Answer and Counterclaims, ¶ 101; Opposition, p. 16. Genericness is a proper ground for cancellation of a trademark registration. 15 U.S.C. § 1064(3). However, in light of the Court's determination that Plaintiff's "UGG" trademark is not generic, as discussed in Section III(B) above, Plaintiff's Motion for Summary Adjudication of Defendants' Second Counterclaim for cancellation of trademarks is GRANTED.

#### 2. False Designation

Defendants allege that the origin of certain products sold under Plaintiff's "UGG Australia" trademark is falsely designated, because such products are "not produced in, or imported from, Australia." Answer and Counterclaims, ¶ 103. In order to succeed on their counterclaim for false

---

[13] The marks that Defendants allege should be cancelled are the following:

1) The Ram's Head Logo
2) Plaintiff's word mark, "UGG"
3) Stylized depiction of Plaintiff's "UGG" mark
4) BABY UGGS logo
5) UGHS

designation of origin under § 1125(a), Defendants must demonstrate each of the following elements:

   (1)   [Plaintiff] uses a false designation of origin;
   (2)   the use was in interstate commerce;
   (3)   the use was in connection with goods or services;
   (4)   the false designation is likely to cause confusion, mistake, or deception as to . . . the origin of defendant's goods, services, or commercial activities by another person; and
   (5)   [Defendants have] been or [are] likely to be damaged by these acts.

*Summit Technology, Inc. v. High-Line Medical Instruments, Co.*, 933 F. Supp. 918, 928 (C.D. Cal. 1996). Plaintiff concedes that in addition to its Australian-made products, it also manufactures certain items in New Zealand and China. Devaney Dec., ¶ 5. However, contrary to Defendants allegations, the record demonstrates that Plaintiff's use of the "UGG Australia" mark to sell products not manufactured in Australia is not deceptive. First, Plaintiff marks the country of manufacture on a tag affixed to every product it sells. Devaney Dec., Ex. A. As a result, the geographical origin of Plaintiff's products made in New Zealand and China is fully disclosed to the consumer. Second, most of the sheepskin used to manufacture Plantiff's footwear originates in Australia, even if the assembly of the boots takes place elsewhere. UF 84. Third, it is undisputed that the style of sheepskin boot sold by Plaintiff originated in Australia. Accordingly, because Defendants have failed to demonstrate that Plaintiff uses a false designation of origin in marketing its products, Plaintiff's Motion for Summary Adjudication of Defendants' Third Counterclaim for false designation of source and origin is GRANTED

   3.   Tortious Interference

Under California law, the elements of a claim of tortious interference with contractual relations are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Milne Employees Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1411 (9th Cir. 1991) (citing *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990)).[14] Defendants allege that Plaintiff "has directly contacted [Defendants'] clients and demanded that they stop buying, marketing, and selling [Defendants'] sheepskin footwear as "UG" boots." Answer and Counterclaims, ¶ 107. However, Defendants concede that "cease and desist letters do not constitute acts [of] tortious interference with valid trademarks." Opposition, p. 18. In light of the Court's determination that Plaintiff's "UGG" trademark is valid and protectable, Plaintiff's Motion for Summary Adjudication of Defendants' Fourth Counterclaim for tortious interference with prospective business and contractual obligations is GRANTED.

---

[14] The elements of a cause of action for intentional interference with prospective business advantage are essentially the same as those for intentional interference with contractual relations, except instead of demonstrating a valid contract, the plaintiff must demonstrate "an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff." *Pacific Gas*, 50 Cal.3d at 1126 n.2.

4. Trade Libel

In order to establish a claim for trade libel, Defendants must demonstrate "(1) a [disparaging] publication, (2) which induces others not to deal with [Defendants], and (3) special damages." *Aetna Cas. & Surety Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir.1988). Plaintiff argues that Defendants have not identified any evidence of a disparaging publication by Plaintiff. Motion, p. 23. Defendants respond that "Deckers statement their UGG brand is the authentic, original, and genuine sheepskin boot is a disparaging statement because it necessarily implies that Koolaburra's products are not original or authentic ug boots." Opposition, p. 18. However, such a statement, which refers only to Decker's own products, and not Defendants products, will not support a trade libel claim. *Atlapac Trading Co., Inc. v. American Motorists Ins. Co.*, No. CV 97-0871 CBM, 1997 WL 1941512, at *6 (C.D. Cal. Sept. 19, 1997) (finding no product disparagement where plaintiff advertised its own product as "pure olive oil," but made no representation as to competitor's product); *Zerpol Corp. v. DMP Corp.*, 561 F. Supp. 404, 412 (E.D. Pa. 1983) (dismissing trade libel claim where defendant's advertisements could not reasonably be interpreted as referring to plaintiff). Because Defendants have failed to demonstrate that Plaintiff has made a disparaging statement about Defendants' products, Plaintiff's Motion for Summary Adjudication of Defendants' Fifth Counterclaim for trade libel is GRANTED.

### F. Defendants' "Cross-Motion" For Partial Summary Judgment Is Stricken

On February 1, 2005, Defendants filed their Opposition, which was titled "Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, and in Support of Cross Motion for Partial Summary Judgment." Pursuant to the Court's Scheduling and Case Management Order (the "CMO"), filed on June 24, 2004, the deadline for hearing motions for summary judgment was February 21, 2005. Pursuant to Local Rule 6-1, "[t]he notice of motion and all moving papers in support thereof shall be filed with the Clerk not less than twenty (20) days prior to the Motion Day for which the matter is noticed." *See* Local Rule 6-1. Because February 21, 2005 was a court holiday, Defendants were required to file any motion for summary judgment no later than January 24, 2005. Accordingly, Defendants' cross-motion, filed on February 1, 2005, is not timely. In addition, Defendants violated the CMO by failing to file the required Separate Statement of Uncontroverted Facts and Proposed Statement of Decision. CMO, pp. 6-11. Finally, Defendants failed to make the required representations as to their compliance with Local Rule 7-3. For all the foregoing reasons, Plaintiff's request to strike Defendants' Cross-Motion for Partial Summary Judgment is GRANTED.

## IV. Conclusion

For all the foregoing reasons and those stated on the record at the hearing on February 14, 2005, Plaintiff's Motion for Summary Adjudication of its First Claim for Trademark Infringement, alleged in the Amended Complaint filed on March 2, 2004, is GRANTED. Plaintiff's Motion for Summary Adjudication of its Second, Fifth and Sixth Claims for Unfair Competition, alleged in the Amended Complaint filed on March 2, 2004, is GRANTED.[15] Plaintiff's Motion for Summary

---

[15] Because Plaintiff is entitled to summary adjudication of its trademark infringement claim, it is also entitled to summary adjudication of its unfair competition

Adjudication of Defendants' Second, Fifth, Seventh, Eighth, Eleventh, Nineteenth and Twentieth Affirmative Defenses, alleged in the Answer filed on August 24, 2004, is GRANTED. Plaintiff's Motion for Summary Adjudication of Defendants' Second, Third, Fourth and Fifth Counterclaims, alleged in the First Amended Counterclaims filed on August 24, 2004, is GRANTED.

   IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.

---

claims. The standard for Lanham Act unfair competition is the same as that for Lanham Act trademark infringement. See *Brookfield*, 174 F.3d at 1045 ("To establish a trademark infringement claim under section 32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham Act, Brookfield must establish that West Coast is using a mark confusingly similar to a valid, protectable trademark of Brookfield's"); *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998) ("Section 43(a) now protects both trademarks and trade dress from infringement"). Additionally, the elements of a state law claim for unfair competition are substantially similar to those of the comparable federal claims. See *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1153 (9th Cir. 2002) (in trademark infringement cases "actions pursuant to ... § 17200 are 'substantially congruent' to claims made under the Lanham Act" (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994))); *Denbicare U.S.A., Inc. v. Toys R Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir. 1996) ("... since dismissal of Denbicare's Lanham Act claim was proper, dismissal of its § 17200 claim was proper as well")).